LS Mar., LLC v Acme of Saranac, LLC (2019 NY Slip Op 05617)





LS Mar., LLC v Acme of Saranac, LLC


2019 NY Slip Op 05617


Decided on July 11, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: July 11, 2019

527923

[*1]LS MARINA, LLC, Appellant,
v
ACME OF SARANAC, LLC, Respondent.

Calendar Date: June 4, 2019

Before: Garry, P.J., Egan Jr., Aarons, Rumsey and Pritzker, JJ.


Briggs Norfolk LLP, Lake Placid (Matthew D. Norfolk of counsel), for appellant.
O'Connell & Aronowitz, Albany (Jeffrey A. Siegel of counsel), for respondent.



MEMORANDUM AND ORDER
Egan Jr., J.
Appeal from an order of the Supreme Court (Ellis, J.), entered July 11, 2018 in Franklin County, which denied plaintiff's motion for partial summary judgment.
In 2014, plaintiff purchased the only publicly accessible, full-service commercial marina on Lower Saranac Lake located in the Town of Harrietstown, Franklin County. The marina was originally opened for business in 1924 by Harry E. Duso, one of plaintiff's predecessors-in-interest, and, over the ensuing decades, Duso expanded the marina's commercial footprint, acquiring certain additional parcels of adjacent property and building docks and covered boat slips [FN1]. In the early 1970s, Duso installed swing moorings in the bay in front of the marina's main boathouse, which have been in continuous seasonal operation since such time [FN2]. The property consists of approximately 17 acres and, at the time of its 2014 purchase, plaintiff believed the sale included, among other things, six rental cabins, a showroom, garage, two residential homes, the covered boat slips, boat docks and moorings and the underwater property rights corresponding thereto. Following the purchase, and in conjunction with its plan to improve and expand the marina, plaintiff thereafter submitted applications to the Town of Harrietstown Planning Board (hereinafter the Board), the Town of Harrietstown Zoning Board of Appeals (hereinafter the ZBA) and the Adirondack Park Agency (hereinafter the APA) seeking [*2]approval for its proposed expansion project [FN3]. In 2015, plaintiff obtained the Board's approval for the project and, thereafter, a special permit for the construction and installation of floating docks from the ZBA. In 2016, as part of the APA's concurrent review process, it was discovered that title to the lake bottom rights underneath the marina's mooring field and 154-foot floating dock (hereinafter the claimed area) were not actually owned by plaintiff or the state. Plaintiff subsequently determined that title to the claimed area was held by the estate of Donald Moreau and, in the fall of 2016, it contacted a representative of Moreau's estate regarding same. In January 2017, defendant, whose members oppose plaintiff's proposed marina expansion, was formed and, approximately one week later, purchased title to the claimed area from Moreau's estate by quitclaim deed for the sum of $50,000 [FN4]. The APA thereafter informed plaintiff, by letter dated April 12, 2017, that, given the dispute regarding ownership of the lake bottom rights, further consideration of its permit application would not progress absent "a Supreme Court determination allocating the [underwater] lands to [it], or through submission of the signature of the existing landowner."
In June 2017, plaintiff commenced this action seeking a declaration that it possessed title to the claimed area through adverse possession. Following joinder of issue, plaintiff moved for partial summary judgment on its adverse possession claim [FN5]. Defendant opposed the motion and, following oral argument and the submission of various supplemental exhibits, Supreme Court denied the motion, determining, among other things, that a triable issue of fact existed with regard to whether plaintiff attempted to purchase and obtain a deed to the property, thereby negating the requisite element of hostility on its adverse possession claim. Plaintiff appeals.
To establish its claim for adverse possession, plaintiff was required to prove, by clear and convincing evidence, that its possession of the claimed area was "(1) hostile and under claim of right; (2) actual; (3) open and notorious; (4) exclusive; and (5) continuous for the required [10-year] period" (Walling v Przybylo, 7 NY3d 228, 232 [2006]; see Bergmann v Spallane, 129 AD3d 1193, 1193 [2015]; Wilcox v McLean, 90 AD3d 1363, 1364 [2011]). Where the adverse possession claim is not based upon a written instrument, the party asserting the claim must demonstrate that the claimed area was, as relevant here, "usually cultivated or improved" (RPAPL former 522 [1], [2]; see RPAPL former 521; Estate of Becker v Murtagh, 19 NY3d 75, 81 [2012]; 2 N. St. Corp. v Getty Saugerties Corp., 68 AD3d 1392, 1393 [2009], lv denied 14 NY3d 706 [2010])[FN6]. The type of cultivation or improvement necessary "will vary with the nature and situation of the property and the uses to which it can be applied and must consist of acts such as are usual in the ordinary cultivation and improvement of similar lands by thrifty owners" (Ray v Beacon Hudson Mtn. Corp., 88 NY2d 154, 160 [1996] [internal quotation marks and citation omitted]; accord Wilcox v McLean, 90 AD3d at 1365; see Bergmann v Spallane, 129 AD3d at 1194-1195). Importantly, only that portion of the claimed area that was adequately cultivated and/or improved will be deemed to be adversely held (see Robinson v Robinson, 34 AD3d 975, 976 [2006], lv denied 8 NY3d 805 [2007]).
We find that plaintiff met its prima facie burden of establishing that it adversely possessed the claimed area. In support of its motion, plaintiff submitted, among other things, the [*3]affidavit of Donald Duso Jr., the grandson of Duso and a current mechanic for plaintiff, the affidavit of Michael Damp, a member of plaintiff, and an aerial map depicting, among other things, the location of the moorings and floating dock within the claimed area. According to Donald Duso, he personally assisted with the installation of approximately 20 moorings and anchors in the claimed area between the early 1970s and 2005 [FN7]. From 1970 to 1975, six moorings were initially installed in the claimed area, which were specifically placed to create the "outer bounds or perimeter of the mooring field."[FN8] As the marina's business grew, additional moorings were installed such that, by 2005, there were approximately 20 active moorings available for rent, with all but three or four of the moorings located within the claimed area. Each year, the marina seasonally rented the moorings to boat owners between April and October (hereinafter the boating season) and only those who paid the requisite rental fee were permitted to access or use the moorings. Since the early 1980s, the 14 to 20 active moorings in the claimed area were regularly maintained during the boating season, mooring anchors, ropes and balls were repaired as necessary, and the mooring field was kept clear of debris. Although the nature of this lake bottom property makes it inherently impractical to erect an enclosure (see RPAPL former 522), the perimeter of the mooring field and, in turn, the location of the claimed area were easily discernible based upon the visibility of the mooring balls attached to each mooring anchor, and became even more apparent when boats were actively moored thereto.
According to Donald Duso, his family never asked or received permission to install the moorings and, at all relevant times, believed that they owned the rights to the lake bottom where the moorings were located [FN9]. Notably, at no point in time between the 1970s and 2011 did anyone ever challenge the Duso family ownership of the claimed area or otherwise object to the installation, use and maintenance of the mooring field or floating dock. Further, according to Damp, since 2011, the marina has continued to maintain operations, including the provision of mooring and dock rentals within the claimed area. Based on the foregoing, and given the nature of the unique lake bottom property at issue, we find that the cultivation and use of the claimed area by plaintiff and its predecessors-in-interest was consistent with the nature and practical use that any other owner would make of such property and was sufficiently open, notorious and continuous to put the record owner on notice of the adverse claim (see Robinson v Robinson, 34 AD3d at 977-978; Gorman v Hess, 301 AD2d 683, 684-685 [2003]).
In opposition, defendant failed to raise a material issue of fact requiring trial. Contrary to defendant's assertion, the seasonal nature of plaintiff's use and occupation of the claimed area does not preclude a finding of adverse possession, particularly where, as here, plaintiff's cultivation and use was synonymous with how any other owner might use the claimed area (see Ray v Beacon Hudson Mtn. Corp., 88 NY2d at 160). Further, plaintiff's installation, seasonal use and maintenance of the moorings was not sporadic, as defendant alleges, but persisted each and every boating season since the early 1970s [FN10]. The fact that boaters had a public right-of-way to traverse the waters directly above the claimed lake bottom, moreover, does not negate the fact that use of the subject moorings and floating dock was for the exclusive use by those boaters who paid the requisite rental fees charged by plaintiff and its predecessors-in-interest.
Although Supreme Court determined that a question of fact existed with respect to whether plaintiff's 2016 offer to purchase the lake bottom rights from the Moreau estate negated the element of hostility, we find such inquiry to be irrelevant. Even assuming that the subject dock was constructed within 10 years of plaintiff's 2016 offer to purchase the lake bottom rights, the evidence proffered in support of plaintiff's motion demonstrates that title to the area underlying the subject dock vested with plaintiff's predecessor-in-interest by adverse possession in the 1980s [FN11]. Accordingly, we find that Supreme Court should have granted plaintiff summary judgment on its adverse possession claim (see Quinlan v Doe, 107 AD3d 1373, 1374-1375 [2013], lv denied 22 NY3d 854 [2013]; Robinson v Robinson, 34 AD3d at 977-978). Although plaintiff has acquired title to the claimed area by adverse possession, to the extent that plaintiff's claim is not based upon a written instrument and insofar as it has only acquired title to that portion of the lake bottom that was cultivated, improved and maintained, the record before us is not adequate to permit this Court to fashion an accurate description of the adversely possessed property. Accordingly, we remit this matter to Supreme Court to ascertain, upon such additional proof as may be necessary, the exact description of the claimed area awarded to plaintiff (see Gorman v Hess, 301 AD2d 683, 686 [2003]; Guardino v Colangelo, 262 AD2d 777, 780 [1999]).
Garry, P.J., Aarons, Rumsey and Pritzker, JJ., concur.
ORDERED that the order is reversed, on the law, with costs, motion granted, partial summary judgment awarded to plaintiff, and matter remitted to the Supreme Court for further proceedings not inconsistent with this Court's decision.



Footnotes

Footnote 1: In 1959, Duso incorporated his business and transferred his ownership interest in the marina to a newly-created entity, Crescent Bay, Inc.

Footnote 2: In 1979, Duso died and his sons took over ownership of the marina and related businesses affiliated therewith. The marina remained within the Duso family until 2011 when it was taken over by a creditor/mortgagee and ultimately transferred to Crescent Bay Holdings, LLC, from which plaintiff purchased it in 2014.

Footnote 3: Prior to closing on the marina, plaintiff submitted a pre-application sketch of its proposed expansion project to the Board, which included its plan to install new floating docks in lieu of the moorings.

Footnote 4: William Curran, one of defendant's founding members, owns a neighboring waterfront parcel of property on Lower Saranac Lake, located approximately 300 feet east of plaintiff's marina.

Footnote 5: In its answer, defendant asserted a counterclaim requesting that, should plaintiff be granted title by adverse possession, it be enjoined from interfering with both defendant's and the public's right-of-way, easement and right of passage in the waters over the claimed area.

Footnote 6: The 2008 amendments to the RPAPL (see L 2008, ch 269) are not applicable to this matter as plaintiff maintains that its title to the claimed area vested in the 1980s (see Bergmann v Spallane, 129 AD3d 1193, 1194-1195 n 2; Barra v Norfolk S. Ry. Co., 75 AD3d 821, 825-826 [2010]).

Footnote 7: Supreme Court did not address the installation, use and maintenance of the subject moorings in its July 2018 order.

Footnote 8: Donald Duso explained that that they placed these original moorings a sufficient distance away from shore in order to moor sailboats, yet close enough to shore "to avoid the prevailing westerly winds that are beyond the peninsula of the western part of the marina property and not blocked by land."

Footnote 9: According to Donald Duso, his family believed that the marina's eastern property line extended straight out across the lake in a northeasterly direction from a birch tree located on the shore immediately adjacent to the eastern boundary of the marina's property line. As the claimed area was due west of this perceived property line, the Duso family never questioned their ownership of the property.

Footnote 10: The Duso family also publicly advertised the availability of moorings for rent in local newspapers.

Footnote 11: The lake bottom underlying the dock is located within the perimeter of the original moorings installed in the early 1970s that, as previously noted, were openly, notoriously and continuously occupied on a seasonal basis for three decades prior to the dock's construction.